## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 10 2016, 6:25 am

CLERK
of the supreme court,
court of appeals and
tax court

---

ATTORNEY FOR APPELLANT

Steven Knecht
Vonderheide & Knecht, P.C.
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

---

# IN THE
# COURT OF APPEALS OF INDIANA

---

In re the Involuntary Termination of the Parent-Child Relationship of:

A.C. (Minor Child),

and

S.S. (Mother)

*Appellant-Respondent,*

      v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

February 10, 2016

Court of Appeals Case No.
79A02-1506-JT-678

Appeal from the Tippecanoe Superior Court

The Honorable Faith A. Graham, Judge

Trial Court Cause No.
79D03-1502-JT-22

---

**Mathias, Judge.**

[1] S.S. ("Mother") appeals the order of the Tippecanoe Superior Court terminating her parental rights to her minor daughter. Mother presents one issue, which we restate as whether the evidence was sufficient to support the trial court's termination order.

[2] We affirm.

## Facts and Procedural History

[3] Mother has two children: an older son, B.S. ("Son"), who was born in August 2002, and a younger daughter, A.C. ("Daughter"), who was born in January 2010. S.S.'s ex-husband, C.S., is the father of Son, and Mother's on-again/off-again boyfriend, T.C., is the father of Daughter.

[4] Mother is developmentally delayed, as is Son. In October 2013, Son was admitted to a behavioral health center for having command auditory hallucinations that told Son to harm himself. Son has also been diagnosed with Psychotic Disorder, Attention Deficit Hyperactivity Disorder, Impulse Control Disorder, and Obstinate Defiant Disorder.

[5] On January 22, 2014, the Tippecanoe County Department of Child Services ("DCS") received a report that Mother was using inappropriate discipline, that T.C. had a substance abuse problem, and that domestic violence was occurring between Mother and T.C. During the subsequent DCS investigation, Mother denied abusing the children and refused to sign a DCS safety plan, claiming

that she had signed such plans before in the past. Son told the investigators that T.C. had smacked him in the mouth before and that Mother attempted to whip him with a belt, but that he was able to avoid her attempts by moving out of the way. Son further stated that Mother and T.C. frequently argued and that T.C. had hit Mother in the past, causing her to have a black eye. Son stated that when Mother and T.C. argued, he took his sister into the other room to avoid being around the argument. He also told DCS that T.C. would sometimes get so drunk that Mother would tell him to leave.

[6] On February 14, 2014, DCS received another report, this time alleging that Son had bruises caused by Mother's physical abuse. During the investigation of this report, DCS personnel discovered bruising on Son's leg, which he explained was caused by Mother hitting him with a belt and other objects. Son explained that Mother and T.C. had been fighting more frequently and that, on one occasion, he attempted to intervene, resulting in T.C. smacking him in the face, leaving a mark. Son also stated that Mother hit him on a daily basis because he made Mother angry. Daughter confirmed Son's report that Mother hit him with a belt. Mother stated that she attempted to hit Son with a belt but claimed that she was unable to actually hit him. Mother was unable to tell DCS personnel what other forms of discipline might be more appropriate. She then reluctantly signed the DCS safety plan.

[7] DCS filed a petition on February 27, 2014, alleging that Son and Daughter were Children in Need of Services ("CHINS"), but did not remove the children from Mother's home at that time. In March 2014, Daughter revealed that, on more

than one occasion, Son had touched her genital area both above and underneath her clothing and had attempted to touch her anus. Daughter also reported that she had seen Son's "privates." Ex. Vol. 1, DCS Ex. 3, pp. 2, 15, 36. Daughter reported that, when she told Mother about Son touching her inappropriately, Mother told Son to stop, but Son ignored Mother and continued to do so. As a result, DCS petitioned the trial court to remove the children from Mother's care. During the CHINS proceedings, Mother had trouble believing that Son might have molested Daughter. Mother stated that she would not be able to supervise the children at all times or separate the children and would even permit them to play together. On March 25, 2014, the trial court granted the DCS's request and removed the children from Mother's care. Son was eventually reunited with his father, and Daughter was placed in relative foster care with her paternal aunt ("Aunt").

[8] In the trial court's May 16, 2014 dispositional order, the court ordered Mother to: undergo a mental health assessment, a parenting assessment, and a domestic violence assessment; take parenting skills classes; participate in home-based case management; and participate in visitations with the children. By all accounts, Mother attempted to cooperate with the services. However, due to her mental health issues and limited cognitive abilities, DCS believed that Mother's parenting skills did not sufficiently improve to the point of being able to properly care for Daughter.

[9] Mother has a history of depression, and told DCS she had been diagnosed with dysthymia. She also had symptoms of generalized anxiety and trauma-related

anxiety, related to childhood abuse. Psychological examination of Mother revealed that she scored lower than 98% of adults in cognitive abilities. Yet, Mother either does not understand or lacks awareness of her limited abilities. She also has an increased risk for anger management problems as a parent. Mother also appears overly dependent on her boyfriend and feels "anxiously helpless" when she is not involved with a man. She relates to her boyfriends in a submissive, passive way and is easily manipulated.

[10] Mother was ultimately diagnosed with persistent depressive disorder, generalized anxiety disorder, dependent personality disorder, and borderline intellectual functioning. These intellectual problems likely accounted for Mother's difficulties with memory, focus, and learning and implementing the information she received while participating in services. Although Mother generally attended her service appointments, she took longer to complete them because of sporadic attendance.

[11] One of the services offered to Mother to help with the initial plans for reunification was to obtain stable housing and employment. However, Mother was kicked out of the "Seeds of Hope" apartment for breaking rules, including violating the curfew so that she could go see T.C. She then moved in with her father but admitted to DCS that this was not a place where her children could live. By the time of the termination hearing, Mother had housing, but the utilities were in the name of a third party due to Mother's existing debts to the utility providers.

[12] Mother's interactions with Daughter during visitations demonstrated a bond between the two. However, Mother also was unable to provide proper discipline and direction for Daughter and failed to use the parenting skills that were taught to her. Mother made promises to the child she could not keep and had to be redirected by service providers. She also, contrary to the rules, asked her child about her placement in relative foster care. The limitations of Mother's parenting skills were also shown during visitation when Daughter would walk away from her. Instead of going after Daughter, a service provider had to intervene. At other times, Mother did not spontaneously interact with Daughter and would not do so unless a case worker or Daughter initiated the interaction. Also, "if left to her own devices and not pressed," Mother had periods of being "detached" from the children. Tr. p. 39. This was not due to a lack of cooperation on Mother's part but on her inability to construct positive activities with the child. Although Mother did well in attending the visitations, she would "go [] through the motions and do[] the bare minimum." Tr. p. 33.

[13] The visitation supervisor who testified at the termination hearing explained that, in her opinion, Mother lacked the ability to parent Daughter on a full-time basis. If Daughter became upset, Mother would give in to the child's demands. Her relationship with Daughter was less of a parent-child relationship and more of a peer-to-peer relationship. Mother's limited cognitive abilities made it difficult for her to provide her children with a structured learning environment. Perhaps most concerning is that Mother had difficulty believing that Daughter had been sexually molested by Son. The DCS case manager testified that

Mother had shown no commitment to making sure that the molestation did not reoccur.

[14]  When Daughter was first removed from Mother's care, she had pronounced behavioral issues. She would throw tantrums when she did not get her way. She was also aggressive towards animals and, at the age of four, tragically squeezed one of Aunt's kittens to death. Daughter was eventually diagnosed with post-traumatic stress disorder due to her experiences in Mother's care. She was clingy to her foster family and anxious around strangers. She had difficulty sleeping and a fear of being left alone. She was prone to disassociation and "emotional numbing," and had an exaggerated startle response. Ex. Vol. 4, DCS Ex. 18, pp. 35.

[15]  She was overly sensitive to situations that reminded her of arguing or conflict, and demonstrated a depressed mood, crying, and poor concentration. Her therapist believed this was related to the domestic violence to which she was exposed in Mother's care. After initial visitations with Mother that included Son, Daughter was observed engaging in inappropriate sexual behavior, e.g., using toys to rub her genital area.

[16]  In contrast, Daughter was doing well in relative foster placement with her Aunt. Aunt was cooperative with Daughter's therapy and treatment. By the time of the termination hearing, Daughter's behavior had improved. She was more consistent in following household rules, more open and talkative, and

would listen and obey when given directions. Daughter became close and bonded to her Aunt and her family.

[17] After fifteen months of providing services to Mother, DCS decided that Mother's progress was stagnant. DCS then changed Child's permanency plan from reunification with Mother to termination of Mother's parental rights and adoption. Aunt desires to adopt Daughter.

[18] On February 18, 2015, DCS filed a petition to terminate Mother's parental rights to Daughter.[1] The trial court held an evidentiary hearing on the termination petition on May 15, 2015, and took the matter under advisement. On May 21, 2015, the trial court entered an order terminating Mother's parental rights to daughter. Mother now appeals.

## Termination of Parental Rights

[19] "The purpose of terminating parental rights is not to punish parents but to protect their children. Although parental rights have a constitutional dimension, the law allows for their termination when parties are unable or unwilling to meet their responsibility as parents." *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004) (citation omitted). Indeed, parental interests must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights. *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009).

---

[1] Son was placed in the care of his father, and DCS did not seek to terminate Mother's parental rights to Son. Tr. p. 142.

Indiana Code section 31-35-2-4(b) provides that a petition to terminate parental rights must meet the following relevant requirements:

> (2) The petition must allege:
>
> (B) that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Indiana Code section 4(b)(2)(B) is written in the disjunctive; therefore, the trial court is required to find that only one prong of subsection 2(b)(2)(B) has been established. *In re A.K.*, 924 N.E.2d 212, 220 (Ind. Ct. App. 2010). DCS must prove "each and every element" by clear and convincing evidence. *G.Y.*, 904 N.E.2d at 1261; Ind. Code § 31-37-14-2. Clear and convincing evidence need not establish that the continued custody of the parent is wholly inadequate for the child's very survival. *Bester v. Lake County Office of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005). Rather, it is sufficient to show by clear and convincing evidence that the child's emotional development and physical development are put at risk by the parent's custody. *Id.* If the court finds that

the allegations in a petition are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

## Standard of Review

We have a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). We neither reweigh the evidence nor assess witness credibility. *Id*. Importantly, we consider only the evidence favorable to the trial court's judgment and the reasonable inferences to be drawn from this evidence. *Id*.

Where, as here, the trial court enters findings of fact and conclusions of law in its termination of parental rights,[2] we apply a two-tiered standard of review. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*. We first determine whether the evidence supports the findings; we then determine whether the findings support the judgment. *Id*. Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference. *Id*. If the evidence and inferences support the trial court's decision, we must affirm. *Id*. Likewise, we will set aside the trial court's judgment terminating a parent-child relationship only if it is "clearly erroneous." *Id*. In this context, "clear error" is that which "leaves us with a

---

[2] Although trial courts are not statutorily required to enter findings of fact and conclusions of law when terminating parental rights, we have nevertheless held that, given the constitutional import of such a decision, trial courts *must* "enter findings of fact that support the entry of the conclusions called for by Indiana statute and the common law" when issuing an order terminating parental rights. *In re A.K.*, 924 N.E.2d 212, 220 (Ind. Ct. App. 2010).

definite and firm conviction that a mistake has been made." *Id.* (quoting *J.M. v. Marion Cnty. Office of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004)).

We further note that, when reviewing a judgment requiring proof by clear and convincing evidence, we may not impose our own view as to whether the evidence is clear and convincing. *In re Guardianship of B.H.*, 770 N.E.2d 283, 288 (Ind. 2002). Instead, considering only the probative evidence and reasonable inferences supporting the judgment and without weighing evidence or assessing witness credibility, we must determine whether a reasonable trier of fact could conclude that the judgment was established by clear and convincing evidence. *Id.*

## I. Conditions That Led to Removal

Mother first claims that the DCS did not present sufficient evidence to support the trial court's determination that a reasonable probability exists that the conditions which led to Daughter's placement outside Mother's home would not be remedied.

When making a determination as to whether a reasonable probability exists that the conditions resulting in a child's removal or continued placement outside of a parent's care will not be remedied, the trial court must judge a parent's fitness to care for her child at the time of the termination hearing while also taking into consideration evidence of changed circumstances. *A.D.S.*, 987 N.E.2d at 1156-57. The trial court is also required to consider the parent's habitual patterns of

conduct in order to determine the probability of future neglect or deprivation of the child. *Id.* at 1157. The trial court may consider evidence of a parent's prior history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* The trial court may also consider the services offered to the parent by DCS and the parent's response to those services as evidence of whether conditions will be remedied. *Id.* DCS is not required to provide evidence ruling out all possibilities of change. *Id.* Instead, it needs to establish only that a "reasonable probability" exists that the parent's behavior will not change. *Id.*

[27] Here, the CHINS proceedings were initiated because of Mother's physical abuse of Son and the domestic violence that was occurring in the home, and the children were removed from Mother's care when DCS received reports, later substantiated, that Son was touching Daughter in a sexual manner. During the subsequent investigation, Mother indicated that she would not keep the children separated and would allow them to play together.

[28] DCS presented evidence that Mother suffers from a low cognitive ability and responded very slowly and incompletely to the services provided to her. Even at the time of the termination hearing, Mother had difficulty believing that Daughter had been molested by Son. Her limited cognitive abilities and passive personality made her at risk for entering into another abusive relationship. Indeed, she was kicked out of one apartment for violating curfew to see T.C., who had previously given her a black eye. Although Mother notes that Son is now in the care of his father, Mother's parental rights to Son were not

terminated. Thus, the trial court could reasonably infer that Son and Daughter would still interact.

[29] In short, under the present facts and circumstances, the trial court did not clearly err when it concluded that a reasonable probability exists that the conditions that led to Daughter's removal from Mother's home would not be remedied. Mother's arguments to the contrary are simply a request that we reweigh the evidence and come to a conclusion different than that reached by the trial court. This is not our role as an appellate court.

## II. Continuation of Parent-Child Relationship

[30] Mother also attacks the trial court's conclusion that a reasonable probability exists that continuation of the parent-child relationship posed a threat to the well-being of the child. As noted above, Section 4(b)(2)(B) is written in the disjunctive and the trial court need find that only one prong of this subsection has been established by clear and convincing evidence. *In re A.K.*, 924 N.E.2d at 220. Because the trial court here properly found that a reasonable probability exists that the conditions which led to Daughter's removal from Mother's home would not be remedied, we need not address Mother's claims regarding the continuation of the parent-child relationship.

## III. Best Interests of the Child

[31] Mother also challenges the trial court's conclusion that termination of her parental rights was in the best interests of Daughter. When determining what is in the best interests of a child, the trial court must look beyond the factors

identified by the DCS and look to the totality of the evidence. *A.D.S.*, 987 N.E.2d at 1158. In so doing, the court must subordinate the interests of the parent to those of the child. *Id*. The court need not wait until the child is irreversibly harmed before terminating the parent-child relationship. *Id*. A recommendation by the case manager or child advocate to terminate parental rights is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id*. at 1158-59. Permanency is a central consideration in determining the best interests of a child. *Id*. at 1159.

[32] Daughter was exposed to domestic violence and sexual molestation while in Mother's care, and Daughter had behavioral and emotional problems as a result. Mother, although bonded with her child, did not possess the skills to properly care for her and showed no significant improvement despite being offered, and participating in, services for an extended period. In contrast, Daughter appears to be doing much better in the care of Aunt, who directly participates in Daughter's therapy. The DCS case manager testified that, in her opinion, it was in Daughter's best interests for Mother's parental rights to be terminated. Accordingly, we cannot say that the trial court erred in concluding that termination of Mother's parental rights to Daughter was in the best interests of Daughter.

## Conclusion

[33] This is a tragic case. Mother and Daughter love each other and appear to be bonded. We sympathize with Mother, who even DCS admits appeared to try to the best of her limited abilities. However, the fact remains that, while in

Mother's care, Daughter was exposed to domestic violence and sexual molestation by her own brother. Mother was unwilling or incapable of accepting that her son had molested Daughter. Despite her efforts, no significant changes in Mother's parenting abilities were apparent despite fourteen months of services. Although a different trier of fact might have come to a different conclusion, under our very deferential standard of review, we are unable to say that the trial court's decision to terminate Mother's parental rights to Daughter constitutes clear error.

[34] Affirmed.

Kirsch, J., and Brown, J., concur.